FRUGÉ, Judge ad hoc.
Defendant-appellant appeals from a judgment casting him in the sum of $269.-22 in connection with his contract with subcontractor A. Switzer, plaintiff-appel-lee, herein.
This is a suit, in which the only issue is the interpretation of the provision of the plans and specifications. And that is whether certain electrical work was called for in the plans and specifications.
L. S. U., as owner, entered into a contract with defendant-appellant, Robert L. Bozeman, a contractor, to remodel the third floor of Nicholson Hall, which remodeling work consisted only in subdividing some of the large rooms and hallways into small offices. The remodeling work was to be in accordance with plans and specifications prepared by architects.
Bozeman then entered into a sub-contract with plaintiff-appellee, A. Switzer, under the terms of which Switzer was to do all of the electrical work required under the plans and specifications for $1,183.
During the course of the job, Switzer claimed that the plans and specifications only called for one new electrical ceiling fixture, whereas, in order for the job to be complete, it was necessary to furnish and install many additional new electrical ceiling fixtures. Switzer then requested the architects to grant him an extra allowance from L. S. U., to enable him to install these “claimed” additional new electrical ceiling fixtures. The architect ruled that *763 the plans and specifications were clear and that all new electrical ceiling fixtures required to complete the job were specified in the plans and specifications.
Switzer, despite repeated demands from Bozeman, refused to complete the job, so Bozeman hired another electrical company to finish Switzer’s contract. This latter company completed the job at a cost to Bozeman of $687.59. Bozeman then deducted this amount from the electrical subcontract price and paid the difference to Switzer. This suit followed, in which Switzer claimed this $687.59, which was the amount deducted from his contract price.
The district court held that Switzer was wrong and that the new electrical ceiling fixtures required to complete the job were all specified in the plans and specifications, and therefore, covered by Switzer’s subcontract; this item included $102.16 paid the new electrical contractor to install the fixtures, and $238.87 paid for the fixtures themselves. The district court also found that Switzer had not “grounded” the outlets to which the fixtures were attached, and recognized the amount paid by Boze-man to this new electrical contractor of $80.32 to have such work done.
However, the district court held that the $269.22 which Bozeman paid this new electrical contractor to install the electrical work for the telephones were not specified in the plans and specifications, and, therefore, not included in the electrical sub-contract that Switzer had with Bozeman. Accordingly, the lower court granted judgment to Switzer against Bozeman for $269.22.
We are not favored with written reasons by the trial court.
The only issue involves the interpretation of a contract. Since the plans and specifications by the architects is made part of the contract, we must determine whether they require that the telephone outlets be connected by conduit with the existing telephone panel in the building.
The plans have a legend thereon where various symbols are listed, with the meaning of each symbol shown opposite thereto. For example, there was a small circle with radiating lines, spoken of during the trial as “rising sun”, and opposite which were the words “Elect. Clng. Fixture”, meaning electrical ceiling fixture. And there were symbols for bookscase, new partition, electrical base outlet, etc. Additionally, there was a symbol of an inverted triangle, opposite which was the word “Telephone”. This inverted triangle, meaning telephone, was shown in six places on the plans, indicating that there were to be six telephone outlets installed.
The question involved is whether, by showing such symbol of an inverted triangle that only the outlet itself was called for, or whether that outlet was also to be connected with the telephone panel already in use in the building. Now, if only the outlets were called for and it was not required to connect such outlets up with the panel so that service could be had, it is obvious that another contract would have to be let to connect the outlets up with the panel in order to use the telephones. It would appear to be an absurd consequence to say that the contract called for the outlets, but did not require that they be connected with the panel, in view of the specifications.
The specifications made it clear that this was to be a completed job “including tying utilities all into existing services”, and was to be “ready for immediate use”. The plans and specifications called for all “work evidently necessary within the general intent (thereof) * * * for the * * * thorough completion of the work”. We quote these provisions of the specifications, viz.:
“Scope of work and general items: “Extent of work: It is the intent of these specifications to cover all required labor and materials for the remodeling interior of Nicholson Hall, Third Floor, LSU, Baton Rouge, La.; *764 The- contractor shall perform all work required for the completion of this work in accordance with these specifications and accompanying drawings ready for occupancy; including tying utilities all into existing services”.
“Scope: These specifications, together with the drawings, are intended to cover all labor, materials and appliances of every kind required to provide all necessary electrical work and electrical -fixtures for the remodeling job. All the work shall be ready for immediate use before the same will be accepted.”
“Extra work: No additional com-, pensation ’.will be allowed for work evidently necessary within the general intent of these specifications and accompanying plans for the proper construction and thorough completion of the work.”
Arthur G. McLavy, the electrical contractor who completed the electrical work for Bozeman, testified about this conduit to connect the telephone outlets with the. existing telephone panel in the building, viz.:
“Q. Now what is your other item? A. That was to furnish the necessary labor and materials to put in a conduit telephone system as required by the telephone company.
“Q. To put in what? A. A tele- ■■ phone system for existing telephone - panels to outlets as shown on the plans according to directions by the telephone company and the University.
“Q. Was that work the type of work customarily the telephone company did? A. No, sir.
“Q. Was that work called for in these plans and specifications? A. You are asking for an opinion now.
“Q. Well, you read the plans and specifications, didn’t you? A. Yes, sir.
“Q. Was that work called for? Can you point out on the plans and specifications where it is called for? A. It is not called for on the plans, and specifications in so many words,, but it’s the general practice in any commercial building or any building used as an office building to have a. continuous conduit system for the telephone company to install their wires.
“Q. What requirement is shown oni the plans with reference to telephones ? A. Just the outlets are indicated.
. “Q.. Just the outlets are indicated? A. 'Yes.
“Q. And from that you draw the conclusion that you are supposed to-connect those up with the telephone wires from outside of the building? A. No.
“Q. What is that? A. You would draw the conclusion from that that you would have to extend from the nearest, I would say, panel or junction box in the building in each and every- outlet, a continuous run of conduit.
“Q. Is that customary and standard practice in the • electrical business-in this section in a building such as this? A. Yes.
“Q. Any question about this, any room for debate on that? A. Of course, there would be room for debate on it.
“Q. Well, what is the room for debate? A. Well, I mean in my mind there is.
“Q. Say what is in your mind, Mr. McLavy. A. Nothing.
“Q. The plans indicate here oro page A-l the 3-cornered white symbol and marked opposite it is shown telephone, and how many of those do they have, on this plan? Will you count them? A. Six.
*765 “Q. When you went on the job what work on the telephone installation had been performed before you got there? A. The outlet box had been installed. The outlet box had been installed in the partition and the conduit run out at ceiling level.
“Q. Then what did you do? A. I requested a meeting with representatives from Louisiana State University and the telephone company to meet me out there and we laid out how they wanted it done.
“Q. What was it that you did? A. There is an existing panel, — I forget which end of the hall it is on, east end, yes. We ran a one inch conduit from there out into the corridor and down. We could describe it as down close to the west end and from there branched out to the smaller conduits of the existing outlets or close to them as directed by the telephone company.
“Q. I ask you again in a building such as this is that work cutomarily done by the electrical contractor and not by the telephone people? A. The telephone company does not run any conduit themselves.”
The electrical work in connecting the telephone outlets to the telephone panel by conduit was obviously necessary in accordance with the panels and specifications.
It is our opinion that this work was clearly called for in the plans and specifications. It necessarily follows that it was included in Switzer’s bid which is as follows :
“Confirming phoned price this date * * * Nicholson Hall Elec, per plans and specs. $1183.00.”
It is significant that the record reveals no effort by Switzer with respect to any claim with Bozeman or anyone else that the electrical work necessary to connect the telephone outlets to the existing telephone panels in the building was called for in the plans and specifications. Switz-er testified that he ran a 14 inch conduit from the telephone boxes as shown on the plans by the symbols to points at, in most cases, ceiling height where he could be instructed to bring them to other places. He further testified that he had met Mr. Wilson on the job once or twice to discuss fixtures and other arrangements. He stated that he had written a letter but upon a close perusal of the record no letter in evidence disclosed any reference to telephone connections; we therefore conclude that there was no controversy whatsoever with respect to the telephone connections prior to the date of trial. The record disclosed that Mr. Switzer took the position all along by the letters he wrote and by his testimony in the record that he should have been permitted to charge extra for new light fixtures to be installed on the job which request was denied by the architect. To clarify this point, we take the liberty of quoting from the correspondence in the record.
Bozeman’s letter of August 29, 1956, to Switzer, in part, reads:
“ * * * we take the position however, that the job must be complete in accordance wtih the plans, specifications, and job requirements as interpreted by the architect.
“We will complete our portion of this job by August 31st, 1956, and unless notified to the contrary, in writing, we shall expect the electrical work to be complete also.”
Switzer’s answer to Bozeman, dated August 30, 1956, in part, says:
“Your letter of the 29th received this date. We appreciate your position in this matter * * * but feel also that the fixtures in question * * are not specified * * * as part of our work.
“It is not possible for us to complete this work * * * other than the in- . *766 stallation per plans and specifications * * * which is installed as of this date.”
Bozeman’s letter to Switzer dated September 4, 1956, by registered mail, in part, reads:
“In your letter of August 30, 1956, you have refused to complete the •above mentioned job unless you r e-ceive from the architect a change order covering five different items. Since the University officials and the Architects have advised us that this building must be ready for occupancy by Monday, September 10, 1956, and in view of the position that you have taken in this matter, it appears to us that we are forced to act as follows:
“We hereby notify you that all of your work must be completed by Saturday, September 8, 1956. Further, if you have not shown sufficient progress or made sufficient effort by 8 A.M. Thursday, September 6, 1956, to ■complete this job within the time set forth, we will take over and complete that portion of the electrical work as is now incomplete, and deduct from your contract the cost to us, * *
It is in evidence that Switzer did not •examine the site so that he could be in a position to say where the telephone panel was to which the telephone outlets were to be connected. Nor could he know the ■conditions that were present so that the type and size of conduit could be determined. It is important to quote from the specifications at this point:
“Examination of Site: * * * each bidder will be held to have examined the site and satisfied himself as to the existing conditions * * * that will in any manner affect the work under this contract.”
The specifications did include tying utilities all into existing services and require the remodeled part to be ready for immediate use after acceptance by L. S. U. and called for all work evidently necessary to complete the job. Thus, it appears to us that if Switzer had looked he would have seen the telephone panel on the third floor, and it is obvious that the outlets were to be connected with this panel, and by so doing he would have known the type and size of conduit to use to connect these outlets with the panel. Aside from that, he could have called in the architect, the telephone company and the electrical representative of the University to assist him.
Accordingly, for these reasons, the trial court judgment in favor of plaintiff-appel-lee is hereby reversed and his suit dismissed at his cost.
Reversed.